### PEOPLE v. SIMMONS.

(Supreme Court, Appellate Division, Second Department.   March 11, 1908.)

1. CRIMINAL LAW—APPEAL—HARMLESS ERROR.
   Under the express terms of Code Cr. Proc. § 542, on appeal in a criminal case the Appellate Division must give judgment without regard to technical errors or defects, or to exceptions not affecting substantial rights.

2. LARCENY—"BUNCO MEN" AND "CONFIDENCE MEN."
   Two or more confederates, who, by gaining the confidence of a stranger on the ground of alleged professed acquaintance with him or his friends, lure him to a place where he is afterwards fleeced at some game, or robbed of his money, or otherwise victimized, are "bunco men" and "confidence men."
   [Ed. Note.—For other definitions, see Words and Phrases, vol. 1, p. 904; vol. 2, p. 1421.]

3. CRIMINAL LAW—ARGUMENT OF COUNSEL—OPENING STATEMENT FOR PROSECUTION—ATTACK ON CHARACTER.
   To describe a defendant as a "bunco man," or a "confidence man," in the district attorney's opening, in view of evidence to be offered showing that he acted as such in the transaction involved, is not an attack upon his reputation, within the rule prohibiting such attack until defendant puts his reputation in evidence.
   [Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, § 1659.]

4. SAME—DESCRIPTION OF METHOD OF COMMITTING OFFENSE—BUNCO SYSTEM.
   Where the evidence showed that defendant and others stole the prosecuting witness' money, acting in confederation by fraud, trick, and device, it was not improper for the district attorney, in his opening, to describe the system of the bunco men's plant, to say that there were usually three or four men engaged in the scheme, and to describe their game.

5. WORDS AND PHRASES—"STEERER."
   A "steerer" is one of plausible manner and address, who gains the confidence of one intended to be fleeced.
   [Ed. Note.—For other definitions, see Words and Phrases, vol. 1, p. 904.]

6. SAME—"SUCKER."
   A "sucker" is a person readily deceived.

7. CRIMINAL LAW—ARGUMENT OF COUNSEL—OPENING STATEMENT FOR PROSECUTION—EVIDENCE TO SUPPORT.
   In a larceny trial, evidence that M. accosted the victim, a stranger, took him to an inn, and thereafter participated with defendant and another in defrauding the victim as the result of a scheme based upon the victim's confidence in M., justified the district attorney's statement in his opening that defendant sent M. to obtain a victim.
   [Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, § 1659.]

8. SAME.
   If, in the trial of a confidence man for larceny, the district atttorney thought that proof of defendant's possession of a banker's directory might

be competent to show that defendant and his confederates had the means whereby one of them, if the occasion required, might appear to be familiar with the banks and bankers of the city where the victim lived, and where the "steerer" told the victim he had been engaged in business, it was not improper for him in the opening to state that such persons as defendant usually have such a directory.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, § 1659.]

9. SAME.

In the trial of a confidence man for larceny, it was not error for the district attorney in his opening to state that such persons usually make a big display of money, "flashing it on their victim," and that they usually have in their pockets decoy letters showing enterprises of a criminal nature for inducing others to engage in such things as wire tapping, and such letters were found in defendant's possession and showed a criminal enterprise, where there was evidence that defendant told the victim he had lately sold horses for $10,000, and exhibited much money at various times; the district attorney not being bound to know that the letters might not become competent evidence as to defendant's motive, intent, or character.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, § 1659.]

10. SAME.

In the trial of a confidence man for larceny, the district attorney's statement in his opening that defendant and his confederates came from the district attorney knew not where, and settled down at Coney Island with a plant ready to do business, was not improper, where the evidence showed that the men had gone to Coney Island from elsewhere and established headquarters there, and that they were engaged in a bunco or confidence game.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, § 1659.]

11. SAME.

In the trial of a confidence man for larceny, the district attorney's statement in his opening respecting conversations between defendant's confederate and the victim was proper, where the evidence showed such conversations, and they were relevant to the issues.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, § 1659.]

12. SAME—APPEAL—HARMLESS ERROR—ARGUMENT OF COUNSEL.

Under Code Cr. Proc. § 542, requiring an appellate court to disregard technical errors or defects, or exceptions not affecting substantial rights, statements by the district attorney in his opening, in the trial of a confidence man for larceny, respecting the contents of letters, etc., found upon defendant when arrested, not within the evidence afterwards adduced, are not reversible errors, when the evidence clearly established defendant's guilt.

13. SAME—ADMISSION OF EVIDENCE—ORDER OF PROOF.

In the trial of a confidence man for larceny, it was not reversible error to admit evidence of conversations between a third person and the victim prior to proof tending to show confederation between such person and defendant, where, when the people rested, the evidence was sufficient to establish a prima facie case of such confederation; the order of proof being within the court's sound discretion.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, §§ 1611, 1612.]

14. SAME — EVIDENCE — ACTS AND DECLARATIONS OF CONSPIRATORS — PROOF OF CONFEDERATION.

Evidence *held* sufficient to establish a prima facie case of confederation by defendant and others to obtain prosecuting witness' money.

**15. SAME—CIRCUMSTANTIAL EVIDENCE.**

 A conspiracy may be proved, as other facts are proved, by circumstantial evidence, and parties performing disconnected overt acts, all contributing to the same offense, may, by the circumstances and their general connection or otherwise, be satisfactorily shown to be conspirators and confederates in the commission of the offense.

**16. SAME—CONDUCT OF COUNSEL—PRESENTATION OF EVIDENCE.**

 Though it is improper for counsel, knowing or chargeable with knowledge that certain testimony is not and cannot be admissible as evidence, to bring it to the jury's attention by offering it or by marking it for identification with the intention of affecting the jury, and flagrant conduct of that kind might be fatal, it was not reversible error in a trial for larceny committed by confidence men for the district attorney to offer for identification, after they had been excluded, torn paper taken from defendant's pocket after his arrest, a bank directory taken from his trunk, and rolls of paper and leather resembling bank bills, where it appears that the district attorney offered them in good faith; his theory being that the rolls were tools of trade used in the scheme.

 [Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, § 1661.]

Appeal from Kings County Court.

Joseph Simmons was convicted of larceny, and he appeals. Affirmed.

Argued before JENKS, HOOKER, GAYNOR, RICH, and MILLER, JJ.

George C. O'Brien, for appellant.

Peter P. Smith, Asst. Dist. Atty. (John F. Clarke, Dist. Atty., on the brief), for the People.

JENKS, J. The defendant appeals from a judgment of conviction for larceny. We must give judgment without regard to technical errors or defects or to exceptions which do not affect the substantial rights of the parties. Section 542 of the Code of Criminal Procedure.

The error first assigned is that of the court in denying defendant's motion at the close of the case to withdraw a juror upon the ground that the district attorney, "certainly not intentionally, has spread before them in his opening an elaborate, extended, condemning, destructive story of the defendant and his associates as to their conduct, their history, their practices, their system, their enterprises, and the manner and methods in which they carried them out, in such a manner, and with such detail and to such an elaborate extent as to make it impossible for the minds of the jury not to be affected by the story told to them by the district attorney in his opening, and that no possible fair result can be reached after all that had gone before them, and none of them being capable of again recalling objections to the admissions of proof." Vann, J., for the court in People v. Wolf, 183 N. Y. 464, 76 N. E. 592, states that the general rule in opening a case is "no fact should be stated unless it is material and competent, and, hence, proper to be proved, subject, however, to reasonable latitude where the law upon the subject is not so elementary that every lawyer should know it." The opening of the learned district attorney was attack-

ed by the defendant by specific objections made at the close of the opening, and coupled with a motion that the court instruct the jury to disregard the statements objected to and strike them out. The learned district attorney replied to each objection when made either that his statement was inadvertent and that he intended at the time to apply it to the case in hand, or that he intended to apply the statement to the facts in the case. Thereafter he also consented to the motion, and the court then instructed the jury:

"Gentlemen of the jury: You have heard the request of the counsel for the defendant, which request is joined in by the district attorney, I will not in detail go over these various requests, but charge you to listen only to the evidence that is adduced here by the prosecution, only that evidence that will be produced here through the mouths of the various witnesses."

I shall examine the objections stated.

The first objection was to the statement, in substance, that these men (referring to certain individuals) are bunco men, that they are known to the criminal fraternity as bunco men, confidence men, and that this was an old form of crime. If the evidence to be offered by the people showed that two or more confederates by gaining the confidence of a stranger on the ground of alleged professed acquaintance with him or his friends lured him to a place where he was afterwards fleeced at some game, or robbed of his money, or otherwise victimized, then the district attorney was entirely right in describing the participants in that scheme as bunco men and confidence men. See Century Dictionary, "bunco," "bunco men," "confidence game," "confidence men." And this is what was done substantially in this case. Myers accosted Arnold, the prosecuting witness, who was a stranger in New York City, wormed his way into his confidence by saying that he had come from the city in which Arnold lived, fastened himself upon Arnold, induced him to visit Coney Island, and there persuaded him to go into an inn There the defendant joined Myers and the prosecuting witness. They, with a man named Stone who pretended to be manager of the inn but was not connected with it, induced Arnold to match coins with them for drinks, and then told him that he had really won $1,000. When Arnold objected to taking the money he was accused of insulting "a Kentucky gentleman"—the defendant. Arnold afterwards was induced to obtain $2,000 on his letter of credit that he might prove that he was able to pay had he lost. When he exhibited the money Myers seized it, and then defendant took possession of it on the ground that Myers had just wagered it for Arnold.

The second objection was that this general statement of the "character" of the defendant was an attack upon his character, which could not be made until the defendant had put his character in evidence. I think that to describe the defendant as a "bunco man" or a "confidence man," in view of the fact that evidence was to be offered showing that he was engaged in such a trick, is not an attack upon his "character" (i. e., his reputation) within the meaning of the rule invoked. If a defendant is put on trial for a burglary, is it an attack on his "character" for the prosecuting of-

ficer to call him a "burglar" in his opening to the jury? It is nothing more than a description of the actor as shown by the evidence to be adduced.

The third objection was that the district attorney described the system of the bunco men's plant, saying that there were usually three or four men engaged in the scheme, and describing the perfect or well-established game which they play. The evidence showed that the money of Arnold was stolen through the criminal conduct of Myers, the defendant, and Stone, acting in confederation by fraud, trick, and device, aptly described in slang parlance as the bunco game or the confidence game (authority supra).

The fourth objection was to the statement of the district attorney in describing the system of such people—that "a steerer" is sent out to get a victim (in their parlance, "a sucker")—in that it is a description of the general system which the district attorney charges up by that statement to the defendant. A "steerer" in slang vocabulary is a person of plausible manners and address, who gains the confidence of the person intended to be fleeced. Century Dictionary, "Steerer." This was, it seems to me, a fair description of what the evidence shows the man Myers was in his relations with Arnold. A "sucker" is a person readily deceived. Ibid. Surely such was the proper description of Arnold as revealed by his own testimony.

The fifth objection was to the statement that Myers was sent by the defendant to obtain a victim, and that such persons usually have a bankers' directory in which are the names of banks and bank directors, on the ground that it did not apply to the facts in this case. The evidence that Myers accosted Arnold, a stranger, took him to the Coney Island inn, and thereafter participated with the defendant and Stone in taking away Arnold's money, as the result of an elaborate scheme based upon the confidence of Arnold in Myers, justified the statement as to Myers and the part he played. It appeared when the effects of the defendant were searched a bankers' directory or something of the kind was found in his possession, and the district attorney subsequently had it marked for identification. I think that within the rule laid down by Judge Vann (ut supra) he was not supposed to know that if he offered it in evidence it must be excluded. The evidence in its detail was yet to be adduced. The district attorney may have thought that proof of the possession of this directory by the defendant might be competent to show that the confederates had the means whereby either Myers as the "steerer" or one of them, if the occasion should arise, might appear to be familiar with the banks and the banking men of the city where Arnold lived and wherein Myers asserted to Arnold he had been engaged in business.

The sixth objection was that the district attorney remarked that such men usually make a big display of money, "flashing it on their victim," and that they usually have in their pockets decoy letters which show enterprises of a criminal nature for inducing other people to engage in such things as wire tapping. The evidence in this case showed that the defendant stated to Arnold that he had lately sold

horses for $10,000, and that he exhibited a large amount of money to him at various times; indeed he proceeded to count out from one amount as much as $200.   So far as the decoy letters are concerned, the district attorney stated that such letters were found in the possession of the defendant, and that they showed an enterprise of a criminal character.   Those letters were subsequently marked for identification, but were not read in evidence.   It appears that one of them was written upon the heading of the Western Union Telegraph Company.   I think within the rule laid down by Judge Vann (ut supra) the district attorney did not commit an error, because he was bound to know that such letters might not become competent evidence as to the motive, intent, or even character, of the defendant.

The seventh objection was to the statement as to the contents of those letters, to the effect that they purported to show that millionaires were to leave the city on a trip, taking a prize fighter with them, who was going "to throw down his backers" in some match they were to make for him—meaning thereby that after the prize fighter had persuaded his patrons to wager their money upon him he would permit himself to be beaten.   These were simply remarks as to the contents of the letters which I have commented upon, and which I shall discuss hereafter.

The eighth objection was to the statement that these men came from the district attorney knew not where, and had settled down at Coney Island with a plant ready to do business, because thereby the district attorney charged that they intended to indulge in wire tapping, fake prize fights; that they were bunco men, confidence men, and ready for such criminal enterprises.   The evidence adduced warranted the conclusion that these men had come to Coney Island from elsewhere, that they had established a sort of headquarters in an inn, and that they were engaged in a bunco game or a confidence game.   The conclusion of the objection as to wire tapping, etc., was not a necessary inference from the statement.

The ninth objection is to the statement as to the conversations between Myers and Arnold in Broadway and Wall street, New York, and in front of Laidlaw & Company's, on the ground that such statement was hurtful to this defendant.   The evidence adduced showed that Arnold did have conversations with Myers in Broadway and in Wall street and in front of Laidlaw & Company's, which I think were relevant to the issue on trial, for reasons hereafter stated.

The tenth objection was to the statement that when the defendant was arrested he was seen to take a paper from his pocket and tear it to bits, and that it was pasted together.   The testimony of the lieutenant of police showed that a police sergeant, after the defendant's arrest, took from the defendant's pocket a paper, torn up.   This was offered in evidence by the district attorney, objected to, and subsequently marked for identification.

I think that all of the statements objected to were fairly within the evidence afterwards adduced, except as to the torn paper and the contents of the letters which were found in the possession of the defendant.   On the other hand there was such a paper and such letters,

and they were offered for identification. I think that the district at-torney is to be credited with the belief that the decoy letters found upon the defendant might be competent upon the question of the defendant's motive and intent in this case which did not present the elements of stealth or violence but of fraud, trick, and chicane. More-over, he probably knew from Arnold that the defendant or his confederates had induced Arnold to sign a statement (which was subsequently read in evidence by the defendant), and he might have supposed that the defendant would contend that the loss of Arnold's money was but a gambling transaction and nothing more. In cases of larceny by scheme, trick, or device, even proof of the commission of similar crimes has been held competent on the question of motive and intent. People v. Dimick, 107 N. Y. 32, 14 N. E. 178; People v. Peckens, 153 N. Y. 576, 592, 47 N. E. 883. See, too, Weed v. People, 56 N. Y. 628; Elliott on Evidence, § 2718. In view of our functions prescribed by section 542 of the Code of Criminal Procedure, I conclude that there was no possibility, in view of the record in this case, that this remark in the opening was prejudicial to the defendant's case. To my mind the evidence for the people established beyond all reasonable doubt that Arnold was deliberately fleeced of his money by the working of a concerted scheme such as is commonly known as a "bunco or confidence game." Each step, from the accosting of Arnold, a stranger in New York, by one of the confederates, until the disappearance of one after the other of them as soon as they had stolen the money, was satisfactorily proven. The defendant offered no evidence whatever save that he marked as an exhibit a paper reading, "We the undersigned have agree to a gambling transazeaction to match coins for two thousand dollars a side and the odd man win the pool. F. Myers, E. Arnold, Tom Johnson." Arnold testifies that Stone asked him to sign the papers, he thinks on the first day, to show that no gambling had been going on "in case there was trouble." Arnold testifies that he did not read it because he did not have his spectacles on, that Myers signed it, and the defendant Simmons signed it as "Jensen" (Johnson). If these statements had never been made in the opening and the letters not marked for identification, it seems to me that the jury could have no reasonable doubt of the defendant's guilt. On the other hand, I fail to see how the proposition can be maintained that there might have existed a reasonable doubt, which however was removed by these statements made to the jury.

I think that it was not reversible error for the court to admit the alleged conversation between Myers and Arnold when the former accosted him, a stranger in New York, and induced him to visit Coney Island in his company. Of course, if the evidence in the case failed to show sufficient proof of confederation or conspiracy for the common purpose of fleecing the witness, the proof of such conversation between the two was not competent as against this defendant. But it was not error to admit these conversations prior to any proof tending to establish the confederation, for the order of proof was within the sound discretion of the court. 8 Cyc. 682, and authorities cited;

Wharton's Criminal Law, § 1401, and notes; Abbott's Trial Brief, Crim. Cas. p. 318; Spies v. People, 122 Ill. 1, 12 N. E. 865, 17 N. E. 898, 3 Am. St. Rep. 320; People v. Miles (decided by this court January 17, 1908) 108 N. Y. Supp. 510. In the case cited upon this point by the learned counsel for the appellant, from which the longest quotation is made, the court says, "It would be error if such proof was admitted, unless such conspiracy was shown before or *after such* evidence was introduced," and, again, "such conspiracy must be shown to exist either before or *after* such evidence is introduced." (The italics are mine.) When the objection was taken to this testimony, the court properly ruled that the evidence would be admitted upon the understanding that it was to be connected, if not, it would be stricken out. I think that, when the people rested, the evidence was sufficient to establish a prima facie case of confederation by the defendant, Myers, and Stone, for the common purpose to obtain criminally the money of the complaining witness. See Kelley v. People, 55 N. Y. 576, 14 Am. Rep. 342; Greenleaf on Evidence, vol. 3, § 93. In the words of Allen, J., in Kelley v. People, supra:

"A conspiracy may be proved, as other facts are proved, by circumstantial evidence, and parties performing disconnected overt acts, all contributing to the same result and the consummation of the same offense, may, by the circumstances and their general connection or otherwise, be satisfactorily shown to be conspirators and confederates in the commission of the offense. One party may allure the victim into the den, leaving it to others to effect the robbery, and all will be held equally guilty as confederates."

It is contended that it was error to permit the district attorney to offer as evidence certain articles found in the trunk of the defendant upon his arrest and after the crime was committed. First, the district attorney offered in evidence a paper taken from the defendant's pocket torn up. This was objected to, and then the district attorney offered it for identification. There is no evidence as to the contents of this torn paper. Second, it appeared that a member of the police found an "American Bank Reporter" in the trunk of the defendant. The district attorney offered it in evidence. This was objected to on certain specified grounds. It was then marked for identification. Third, the district attorney pursued a like course with reference to a roll of paper about the size of a bill and a roll of thin leather, also certain letters found in the defendant's possession and some cards. He also offered in evidence over objection and exception a visiting card given by Myers to Arnold. It is to be noted that none of these articles was received in evidence save the visiting card last mentioned; they were but marked for identification. There is a manifest difference between things received in evidence and things offered, and, when objected to thereafter, marked for identification. It is quite true that articles even when exhibited and only marked for identification, if they can be thereby seen and comprehended by the jury, may have all the effect of evidence upon the jury, and that neither a ruling of exclusion nor instruction of the court to disregard them can efface the effect. And it is a manifestly improper thing for counsel, knowing or chargeable with the knowledge that certain testimony is

not and cannot be admissible as evidence, to bring that testimony to the attention of the jury in a sinister way by offering it or by marking it for identification, with the intention of affecting the jury. A flagrant act of this kind which in itself indicates such intention might well be held fatal to a conviction. But I am convinced that no such course of prosecution or unfairness can be ascribed to the learned district attorney in this case. I see no reason for the conclusion that he, when he knew or should have known that these things were absolutely incompetent and must be so in any event, offered them simply to bring them to the attention of the jury, and when they were objected to, marked them for the same purpose. On the contrary, I think that the learned district attorney offered the things in good faith, and when met by objection or ruling simply marked them for identification at the time he established their source or origin, with the natural idea that if they should ever be competent he might thereafter offer them as theretofore identified. As to the rolls of paper and of leather, the former about the size of a bill, it appears from the evidence that the defendant displayed a "big bunch of bills" out of which he subsequently counted out money, that is, that the witness thought that there was a "big bunch of bills." The theory of the district attorney undoubtedly was that such roll or rolls which resembled bank bills were of the tools of trade thus employed in the scheme. The learned counsel for the defendant lays great stress upon People v. Smilie, 118 App. Div. 611, 103 N. Y. Supp. 348. In that case the complaining witness testified that Smilie had displayed a roll, perhaps of money, but gave no explanation of its contents or appearance, a "jangle" ensued and in the "fracas" Webb's money was taken from him. "Phony rolls" taken from Smilie's trunk three months afterwards were received in evidence, and this was held error. The court said that these rolls in a trunk in June did not tend to show that the defendant stole money from the complaining witness in March previous, that the evidence was most damaging because the jury very likely reached the conclusion that the roll which Smilie had in the saloon was identical with that in the trunk, and that in order to make the evidence admissible it must bear upon the offense charged, whereas "there was no possible connection." The distinction between that case and the case at bar is this: The rolls in the case at bar were not received in evidence but offered and objected to, and then "marked for identification for the present." There was evidence that the defendant did display a "big bunch of bills," and that money was an important element in the scheme; for it indicated that the defendant was a moneyed man, in corroboration of his story that he was a Kentuckian who had just sold his horses for $10,000. It was used in the scheme in the step of pretending to pay the wagers of $1,000 won by the complaining witness and Myers respectively. Third, it was put up in the safe so that therefrom the complaining witness might be paid provided he produced his own money. Without that "big bunch of money" the scheme could not have been worked in the manner as detailed.

I think, then, that when the witness was on the stand who had seized these rolls from the possession of Simmons it was not reversible error for the district attorney, after he had offered them and they were held out under objection, to then mark them for identification. If they had been received in evidence then or later, quite a different question might be presented.

I advise affirmance. All concur.