WYOMING STATE BOARD OF EXAM-
INERS OF OPTOMETRY,
Appellant (Plaintiff),

v.

PEARLE VISION CENTER, INC., a cor-
poration, and Robert L. Holly, O.D., an
individual, Appellees (Defendants).

No. 86–323.

Supreme Court of Wyoming.

Jan. 4, 1989.

Steven F. Freudenthal, Freudenthal, Salzburg, Bonds & Rideout, P.C., Cheyenne, for appellant (plaintiff).

Brent R. Kunz, Hathaway, Speight, Kunz, Trautwein & Barrett, Cheyenne, for appellee (defendants), Pearle Vision Center, Inc.

Dennis M. Grant, Grant & Osborn, Cheyenne, for appellee (defendant), Robert L. Holly, O.D.

Before CARDINE, C.J., THOMAS, URBIGKIT and MACY, JJ., and BROWN, J., Retired.

THOMAS, Justice.

At issue in this case is whether a franchise agreement for the marketing of optical products and services, entered into between a certificated optometrist and a corporation, results in fee splitting or the employment of a "steerer," both in violation of § 33–23–110(b)(i), W.S.1977. Additional questions are raised as to whether the franchiser was engaged in the practice of optometry without a valid certificate of registration in violation of § 33–23–103, W.S. 1977, or, as a general business corporation, was engaged indirectly in the practice of optometry in violation of § 33–23–111(b)(iv), W.S.1977. Section 33–23–110(b)(i), W.S.1977, provides:

"(b) 'Unprofessional and dishonest conduct' as used in this act is hereby declared to mean:

"(i) The loaning of his license by any licensed optometrist to any person; the employment of 'cappers' or 'steerers' to obtain business, 'splitting' or dividing a fee with any person or persons, the advertising by any means whatsoever of optometric practice or treatment or advice in which untruthful, improbable,

misleading or impossible statements are made; * * *."

Section 33–23–103, W.S.1977, provides:

"(a) It is unlawful for any person in the state of Wyoming to practice or attempt to practice optometry or to advertise, or hold himself out as qualified to fit or adjust any lenses or lens in any manner or form as an aid to human eyesight, without first obtaining a certificate to practice optometry."

Section 33–23–111(b), W.S.1977, provides:

"(b) It is unlawful:

*      *      *      *      *      *

"(iv) For any person or persons not holding a certificate or any corporation, directly or indirectly, to practice optometry by employment of or contract with a person holding a certificate, or otherwise, provided that one holding a certificate may accept employment from a person, partnership, association or corporation to practice optometry with respect to the employees of such person, partnership, association or corporation."

The district court denied the injunctive relief sought by the Wyoming State Board of Examiners of Optometry (Board), holding that the arrangement between Pearle Vision Center, Inc. (Pearle), as the franchiser, and Robert L. Holly (Holly), a Board certificated optometrist as franchisee, did not transgress any of these statutory provisions. We are in accord with the judgment of the district court, and we affirm that judgment.

As appellant, the Board states the following issues in urging a reversal of the district court:

"1. Consideration of all the pleadings, affidavits, depositions, stipulated exhibits, and evidence presented to the District Court discloses that the District Court erroneously granted summary judgment in favor of the defendants.

"2. Consideration of all pleadings, affidavits, depositions, stipulated exhibits, and evidence presented to the District Court discloses that there was no genuine issue of material fact, and that Plaintiff was entitled to judgment as a matter of law."

Pearle, as appellee, restates the issues on appeal in this way:

"1. Whether Defendants Pearle and Holly, by virtue of their having executed a franchise agreement and attendant agreements, have established a relationship which places Defendant Holly under the direction and control of Defendant Pearle?

"2. Whether the relationship between Defendants Pearle and Holly constitutes indirect practice of optometry by a corporation in violation of W.S. § 33–23–111(b)(iv)?"

Holly also defends the decision of the district court in his favor, and his statement of the issues is:

"1. Did the District Court err in granting summary judgment in favor of Defendant, Robert L. Holly?

"2. Does the evidence presented to the District Court, in the way of pleadings, affidavits, depositions, exhibits and oral argument, support the district court's finding that there was no genuine issue of material fact and that Defendant, Robert L. Holly, was entitled to judgment as a matter of law?"

On September 16, 1985, the Board brought an action seeking injunctive relief and monetary damages against Holly and Pearle. This action followed the formal opinion of the Wyoming attorney general issued on August 20, 1985 which, in pertinent part, said:

"Section 33–23–111(b)(iv), W.S.1977, precludes a corporation from the practice of optometry in Wyoming. This restriction includes any attempt by a corporation to practice optometry indirectly through the services of an individual who holds a certificate to practice optometry. A franchise agreement between a corporation and an individual licensed to practice optometry gives the franchiser a certain amount of control over the licensed practitioner. Therefore, this form of corporate control is also prohibited by statute."

The Board alleged in its complaint that Holly and Pearle were engaged in fee splitting in violation of § 33–23–110(b)(i), W.S.

1977; Holly was employing Pearle as a "steerer" to obtain business in violation of § 33–23–110(b)(i), W.S.1977; Pearle and/or Holly were engaged in "canvassing" in violation of § 33–23–111(b)(i), W.S.1977; Pearle was engaged in the practice of optometry without a valid certificate of registration in violation of § 33–23–103, W.S. 1977; and Pearle, a general business corporation, was engaged indirectly in the practice of optometry in violation of § 33–23–111(b)(iv), W.S.1977.

Holly and Pearle filed separate answers to the Board's complaint. In each answer, the respective defendant alleged that the relationship between Holly and Pearle was not prohibited by statute or, to the extent it might be prohibited by statute, the prohibition is unconstitutional. Discovery was pursued, and the several parties then moved for summary judgment on all issues. A hearing was set on the motions for summary judgment and, prior to that hearing, the Board withdrew its claim for monetary damages and dropped its allegations that Pearle and/or Holly were engaged in canvassing. The district court received briefs and heard oral argument and then granted summary judgment to Pearle and Holly on all remaining issues and denied the summary judgment sought by the Board.

Pearle is a Texas corporation, and it owns and operates retail optical stores in several states. Holly was licensed as an optometrist in Wyoming in 1983. Early in 1985, Holly wrote to Pearle and suggested that he would be interested in acquiring a Pearle franchise. Several letters from Pearle to Holly explaining various arrangements by which Holly could acquire a Pearle franchise are included in the record. Ultimately, Holly and Pearle agreed to an arrangement that required Holly to enter into a sublease of office space and a separate franchise agreement with Pearle. The action filed by the Board challenged the relationship between Pearle and Holly pursuant to the franchise agreement. The complaint did not allege that the agreement is a sham, or that the true relationship between Pearle and Holly was anything

other than what was set forth in the agreement.

The sublease was for office space at the Frontier Mall in Cheyenne, Wyoming. Pursuant to the sublease, Holly agreed to pay Pearle a base rate and, in addition, a percentage of his total sales in excess of an established amount each month. Approximately two-thirds of the subleased office space was used for dispensing optical goods, and the remaining space was used by Holly to treat patients and perform optometric services. Pictures of the office demonstrate that a wall divided the two areas, separate entrances were available for each area in the office, and a common doorway provided internal access between the two offices.

The franchise agreement provided for the purchase by Holly of a Pearle franchise. The total consideration was $155,-000, and $15,000 was paid in cash with the remaining $140,000 financed by a ten-year loan from Pearle with an interest rate of three percent over the current prime rate. The purchase agreement for the franchise is a carefully drawn and detailed document. It sets forth the duties of the franchiser and the franchisee, and delineates the manner in which the franchisee is expected to operate the franchise. In forty-five pages, the agreement sets forth eighteen separate provisions with several subsections in each provision. The specific terms of both the sublease and the franchise purchase agreement will be discussed in connection with the disposition of the several issues.

Essentially, the Board's two issues are treated together in a series of arguments. The first argument of the Board is that the trial court erred because it did not find that Holly and Pearle violated the provision of § 33–23–110(b)(i), W.S.1977, which prohibits " 'splitting' or dividing a fee." The Board supports its claim that Holly was "splitting" or dividing fees with Pearle by reference to a required royalty which the franchise agreement provided in favor of Pearle. In pertinent part, the franchise agreement provides:

"7.4  *Franchise Royalty*

"(A) Except as provided in paragraph 7.4(D), during the term hereof Franchisee shall pay Pearle a non-refundable monthly royalty equal to eight and one-half percent (8½%) of Franchisee's monthly Gross Revenues (as hereinafter defined) from the sale of goods and services at, from or in conjunction with the Pearle Vision Center. Royalties shall be paid monthly on or before the fifteenth (15th) day of the month following the month during which such goods or services were sold. In the event Franchisee's annual statement of Gross Revenues required pursuant to Paragraph 9.2 hereof discloses a deficiency in royalty payments paid for such year, Franchisee shall pay Pearle the amount of such deficiency at the time the annual statement is delivered. No portion of the royalties collected by Pearle shall be refundable under any circumstances.

"(B) *Definition of Gross Revenues*

"The term 'Gross Revenues' as used in this Agreement shall include all sums charged (whether under third party reimbursement programs or to regular customers and patients and whether or not received in full at time of sale) for optical and ophthalmic goods, merchandise and services and (as permitted by law) optometric and ophthalmologic services and merchandise sold or provided at, from or in conjunction with the Pearle Vision Center licensed herein. The term Gross Revenues excludes federal, state, county, and city sales taxes or other similar taxes levied upon customers on the basis of sales transactions and Allowable Sales Deductions (as hereinafter defined). 'Allowable Sales Deductions' include the balance due on customers' unclaimed orders, reimbursements and price adjustments to insurance carriers and governmental agencies and cash refunds to customers. Allowable Sales Deductions do not include monies lost on returned checks, credit card service charges or any other amounts not specifically included herein.

"(C) If Franchisee is not permitted by law to include in Gross Revenues sums charged for optometric or ophthalmologic

services, or does not have access to information necessary to calculate such sums, then Gross Revenues for all purposes of this Agreement shall mean Gross Revenues as determined under 7.4(B) hereof (without including sums charged for optometric and ophthalmologic services) multiplied by 1.2. Pearle and Franchisee agree that such resulting amount is reasonably equivalent to the Gross Revenues the Franchisee would have under paragraph 7.4(B) hereof if Franchisee had included in Gross Revenues the sums charged for optometric and ophthalmologic services.

\* \* \* \* \* \*

"7.7 *Impossibility*
"If, by operation of law or otherwise, the royalty described in Paragraph 7.4 above cannot be based upon Gross Revenues as herein defined, the parties shall thereupon renegotiate a royalty applicable to revenues from such products and services as may lawfully be included in Gross Revenues or an alternative fee, which shall be sufficient to pay Pearle a return equal to the royalty provided for herein."

The franchise agreement unequivocally requires that monies received by Holly for optometric services be included in calculating the amount of royalty due under the agreement. Whether this requirement transgresses the statutory prohibition described as " 'splitting' or dividing a fee" depends upon a conclusion with respect to the nature of the conduct the legislature intended to proscribe. See *McArtor v. State*, 699 P.2d 288 (Wyo.1985); *Hurst v. State*, 698 P.2d 1130 (Wyo.1985).

In determining the intention of the legislature, we first examine the language of the statute in light of the purposes sought to be accomplished. *K N Energy, Inc. v. City of Casper*, 755 P.2d 207 (Wyo.1988); *Amoco Production Company v. State Board of Equalization*, 751 P.2d 379 (Wyo. 1988); *Hurst*, 698 P.2d at 1130; *School Districts Nos. 2, 3, 6, 9 and 10 in Campbell County v. Cook*, 424 P.2d 751 (Wyo. 1967). In considering the statutory lan-

guage, words are accorded their plain and ordinary meaning unless some indication is present that the legislature intended a different meaning. *Amoco*, 751 P.2d at 379; *Wyoming State Department of Education v. Barber*, 649 P.2d 681 (Wyo.1982); *Croxton v. Board of County Commissioners of Natrona County*, 644 P.2d 780 (Wyo.1982). We assume the legislature intended to invoke a well-settled meaning of a word in the law at the time of its usage unless an unmistakable indication to the contrary is found. *Sorenson v. State*, 604 P.2d 1031 (Wyo.1979); *Johnson v. Safeway Stores, Inc.*, 568 P.2d 908 (Wyo.1977).

The purpose of legislation prohibiting the " 'splitting' or dividing of a fee," as the context demonstrates in this instance, is to protect members of the consuming public; it is not to promote the economic welfare of optometrists. See *People v. Sterling Optical Company*, 26 Misc.2d 412, 209 N.Y. S.2d 953 (1960); *State ex rel. Sisemore v. Standard Optical Company of Oregon*, 182 Or. 452, 188 P.2d 309 (1947); *Golding v. Schubach Optical Company*, 93 Utah 32, 70 P.2d 871 (1937). When the express language of the statute is examined in the context of a purpose of public protection, it is clear that the activity which the legislature intended to prohibit is that which historically has been perceived as detrimental to the public welfare. That activity is described by invoking the slang terminology of "fee splitting," which is defined in Webster's Third International Unabridged Dictionary (1971) as "a dividing of a professional fee for a specialist's medical services with the recommending physician." That purpose would not extend to any conclusion that the legislature intended to prohibit every business relationship in which an optometrist agreed to pay a percentage of his optometric proceeds for a consideration furnished to him unless that consideration included providing patients or referring patients to the optometrist. See also, *Lieberman v. Connecticut State Board of Examiners in Optometry*, 130 Conn. 344, 34 A.2d 213 (1943).[1]

---

**1.** We conclude that cases in which the facts have been found to be sufficiently close to pro-

viding or referring patients or customers, and thus to involve fee splitting, are distinguishable.

The Board did not establish any facts sufficient to raise an issue with respect to whether Holly divides his fees with Pearle. The record establishes that Holly does not pay Pearle to send or direct patients to him. Considered in the context of the agreement, the royalty payment is for the privilege of operating the Pearle Vision Center. The fact that the consideration for that privilege is based in part upon a percentage of the proceeds derived from furnishing optometric services does not make it an agreement for " 'splitting' or dividing a fee" any more than would a consideration for the sublease which was based in part upon a percentage of the optometrist's income. The Board concedes that this latter is not prohibited. Furthermore, this franchise agreement encompasses alternative methods for computing the appropriate royalty fee. We do not understand that the Board would argue that, should Pearle charge a set franchise fee for the operation of the Pearle Vision Center, Holly would be prohibited by the statute from paying the set fee with monies he received from patients for optometric services.

In the absence of some evidence that Pearle in fact sent or referred patients to Holly for remuneration, the district court correctly concluded that there was no genuine issue of material fact with respect to any practice of " 'splitting' or dividing a fee." There, indeed, was evidence that Holly's optometric office was adjacent to the Pearle Vision Center which he managed, and there was a common doorway. The mere placement of an office in a clearly desirable business location, without more, could not lead to a conclusion that the statute was violated. We hold that the district court correctly entered summary judgment in favor of Pearle and Holly on that contention by the Board.

We have not ignored the Board's perfunctory contention that Pearle's "advertising specifically directed or encouraged 'patients' to go to Holly." This claim is more closely related to the Board's allegation that Holly employed "cappers" or "steerers" to obtain business. The Board did not present evidence by affidavit, or otherwise, to support this statement and, ordinarily, its resolution would be a finding of fact to be made by the appropriate arbiter if there were some evidence to pose a material issue in that regard. In the absence of evidence structuring an issue of material fact with respect to whether Holly paid Pearle to direct patients to him through Pearle's advertising, the trial court was not foreclosed from entering the summary judgment on the issue of dividing of fees. See *Bettencourt v. Pride Well Service, Inc.*, 735 P.2d 722 (Wyo.1987).

The only evidence that might lead to an inference in this regard is copies of advertisements which were inserted in the record. A review of those advertisements discloses that the consumers are directed to Pearle and not to Holly for optometric services. Pearle and Holly each have a legitimate interest in promoting the services of Pearle and, therefore, both pay a portion of the advertising costs. In the advertisements introduced into the record, Holly's name is used only as the owner and operator of Pearle, although in one advertisement he is alluded to by a statement that a doctor of optometry "who is right next door" can give any customer a complete eye examination. These advertisements fall short of demonstrating, however, that Pearle, or Holly in collaboration with Pearle, encouraged or solicited patients for Holly's optometric services. All of the advertisements promote the activities of Pearle, and it would be a leap in logic to conclude that this demonstrated the division of Holly's fee for optometric services.

The Board has not directed us to any statute, nor have we found one, which prohibits an optometrist from owning and

See e.g., *State v. Abortion Information Agency, Inc.*, 69 Misc.2d 825, 323 N.Y.S.2d 597 (1971) (the provision by a corporation of salary and hospital facility to a doctor while the corporation billed patients for the doctor's services was held to constitute fee splitting); *Hanks v. Hamilton*, 339 So.2d 1122 (Fla.App.1976) (the written agreement between a broker and a non-registered real estate salesman pursuant to which the salesman was paid a specified commission for his sale of real property was held to be fee splitting).

operating an optical dispensing establishment. Holly, as owner of the store, has a legitimate interest in attracting customers by lawful means. The record does not lend itself to any conclusion that Holly is inhibited from using his own name to attract customers to his Pearle Vision Center. We note that the legislature has prohibited any advertising that consists of "untruthful, improbable, misleading or impossible statements * * *." Section 32–23–110(b)(i), W.S.1977. It has not chosen, however, to prohibit optometrists from advertising and, if the optometrist may advertise his services, we can conceive no reason that would inhibit his joint advertisement of the services of his franchised optical dispensing store so long as the advertisements do not consist of "untruthful, improbable, misleading or impossible statements." The evidence of advertisements certainly did not structure a genuine issue of material fact with respect to the division of fees.

■ We must address the advertisements in the context of the Board's contention that Holly violated § 33–23–110, W.S. 1977, because he engaged in "the employment of 'cappers' or 'steerers' to obtain business * * *." The Board, in presenting this argument, relies upon the advertising contribution provision contained in the franchise agreement. It insists that this provision places Pearle in the position of steering customers to Holly. The essence of the accused provision, Section 8.1 of the franchise agreement, requires that Holly, the franchisee, make an advertising contribution of eight percent of gross monthly revenues to Pearle. Three-fourths of that amount, six percent of the gross monthly revenues, is used by Pearle for the purchase of advertising, both local and national, promoting the various Pearle Vision Centers, whether company-owned or franchises. One-fourth, two percent of gross monthly revenues, is used by Holly, the franchisee, for local advertising placed

through Pearle's regional manager of marketing. Section 8.4 of the agreement also provides that Holly, as franchisee, may engage in advertising and promoting his Pearle Vision Center and the products and services offered at his own expense, but requires that the advertising be submitted to Pearle for its prior written approval.[2] The essence of the Board's argument is that this advertising contribution is different from "advertising placed by an optometrist on a fee basis with radio station, newspaper, or through an advertising agency, where payment is independent of a percentage of the optometrist's gross revenues and the optometrist retains final authority on advertising content." We concede that the Board is correct; the advertising relationship between Pearle and Holly is different from that of a buyer and seller of advertising. We cannot concede, however, that the difference makes the relationship one prohibited by statute. Furthermore, we do not accept the contention that the retention by Pearle of the right to control the content of advertising constitutes prohibited activity because it has an interest in maintaining a uniform consistency in the advertisements utilizing its name.

As we did in our consideration of the issue about "'splitting' or dividing a fee," we conclude that the legislature intended to prohibit a specific style of conduct that is harmful to the consuming public. In the statute, the words "cappers" or "steerers" were used to define the prohibited conduct. These words both have an established definition which we must assume that the legislature intended. Black's Law Dictionary (rev. 4th ed.1968) defines a "capper" as "a decoy or lure for purpose of swindling," citing *Barron v. Board of Dental Examiners of California*, 109 Cal.App. 382, 293 P. 144, 145 (1930). Relying upon the same California case, Black's Law Dictionary, supra, then defines a "steerer" as "one who gains the confidence of the person intended

---

**2.** The argument of the Board on this issue is premised essentially upon the franchise agreement requirement for an advertising contribution, and not on the content of the advertisements. A consideration of the content of the advertisements, however, does not disclose a

statutory violation with respect to the relationship between Pearle and Holly. In this respect, it has no more significance than it had with respect to the suggestion that it demonstrated a division of fees.

to be fleeced and who may be said to steer or lead the victim to the place where the latter is to be robbed or swindled." See also *People v. Simmons*, 125 A.D. 234, 109 N.Y.S. 190, 194 (1908) ("A 'steerer' in slang vocabulary is a person of plausible manners and address, who gains the confidence of the person intended to be fleeced.") These words connote some element of fraud or deceit practiced upon an innocent victim. The Board has neither alleged nor demonstrated, in this regard, any facts which would serve to structure a genuine issue of material fact as to the presence of fraud, deceit, or overreaching on the part of Holly or Pearle. In the absence of some showing of fraud, deceit, or overreaching that was practiced upon and resulted in harm to the consuming public, Holly could not have been said to have employed Pearle as a "capper" or "steerer." As a matter of law, the district court ruled correctly in entering summary judgment in favor of Holly and Pearle on that claim of statutory violation.

We turn finally to the contentions by the Board that Pearle was engaged in the corporate practice of optometry in violation of § 33–23–111(b), W.S.1977, and that it was engaged in the practice of optometry without a valid certificate in violation of § 33–23–103, W.S.1977, and the claim that the district court erred in ruling to the contrary. We first recall the relevant statutory provisions.

Section 33–23–103(a) provides, in pertinent part:

"It is unlawful for any person in the state of Wyoming to practice or attempt to practice optometry or to advertise, or hold himself out as qualified to fit or adjust any lenses or lens in any manner or form as aid to human eyesight, without first obtaining a certificate to practice optometry."

Section 33–23–111(b) provides, in pertinent part:

"It is unlawful:

\* \* \* \* \* \*

"(iv) for any person or persons not holding a certificate or any corporation, directly or indirectly, to practice optometry by employment of or contract with a person holding a certificate, or otherwise, provided that one holding a certificate may accept employment from a person, partnership, association or a corporation to practice optometry with respect to the employees of such person, partnership, association or corporation."

Section 33–23–101 defines the practice of optometry as:

"(a) The practice of optometry is the employment of any means other than surgery for diagnosing and treating ocular pathology and for the measurement of the powers or range of human vision or the determination of the accommodative and refractive status of the human eye or the scope of its functions in general or the adaptation of lenses or frames for the aid thereof.

"(b) The provisions of this chapter do not prevent a duly licensed physician and surgeon, from treating or fitting glasses to the human eye, or a duly licensed physician and surgeon, oculist, or optometrist from filling prescriptions or orders, nor do they prevent the replacing, duplicating or repairing of ophthalmic lenses or the frames or fittings thereof by persons qualified to write or fill prescriptions or orders under the provisions of this act, nor prevent the doing of the merely mechanical work upon such lenses or upon the frames or fittings thereof by an optical mechanic."

With respect to the claims asserted against Pearle, the Board's basic position is that the district court did not apply the statutory definition of optometry to the facts of this case in reaching its conclusion that Pearle was not practicing optometry in violation of Wyoming law. The Board asserts that, instead, the district court erroneously determined, first, the question of whether optometry should be considered a learned profession in Wyoming and, second, whether Holly was an employee of Pearle. The Board also argues that the district court failed to determine whether the franchise agreement had the effect of involving Pearle in the practice of optometry.

The premise of the Board's argument is the contents of the decision letter issued by the district court on October 14, 1986. Our rule, however, is that we look to the final order rather than the decision letter to determine the findings and conclusions of the trial court. *Broadhead v. Broadhead*, 737 P.2d 731 (Wyo.1987); *DeRoche v. R.L. Manning Company*, 737 P.2d 332 (Wyo. 1987). In this instance, the technique that the district court adopted was to specifically incorporate by reference its decision letter in its order granting summary judgment in favor of Holly and Pearle. Under these circumstances, we will review the reasoning and findings of the district court incorporated in its decision letter, but we still must uphold its decision on any legal grounds that the record is sufficient to sustain. *Ferguson v. Ferguson*, 739 P.2d 754 (Wyo.1987).

We do not understand the decision letter of the district court to be premised upon whether optometry should be considered a learned profession in Wyoming. When the letter is read in its entirety, it simply sets forth the proposition that, in general, a decision as to whether optometry is a learned profession or a mechanical art or craft may affect the level of scrutiny to be applied in determining whether a particular course of conduct constitutes the practice of optometry as defined in a particular statute, citing Annotation, *What Constitutes Practice of "Optometry"*, 88 A.L. R.2d 1290 (1963). In a similar vein, the district court noted that, in decisions in which courts have found a corporation to be practicing optometry without a valid certificate, a critical factor was the fact that the corporation employed optometrists in an optometric capacity in violation of a state statute, citing *Pearle Optical of Monroeville, Inc. v. State Board of Examiners in Optometry*, 219 Ga. 364, 133 S.E.2d 374 (1963); *State of Iowa v. Plymouth Optical Company*, 211 N.W.2d 278 (Iowa 1973). The decision letter is not premised upon the employment proposition either, and the district court did not state that it relied upon it in making its determination. A thorough reading of the entire decision letter discloses that the district court did make a proper determination as to whether Pearle was guilty of directly or indirectly practicing optometry, either through the technique of the employment of Holly or by virtue of the franchise agreement with him. In conclusion, the district court stated:

"[T]his court has determined that defendant Pearle is not guilty of indirectly or illegally practicing optometry, in that said corporate defendant has no control over any other functions specifically involved with the practice of optometry as that term is defined in the statute. Further, it is clear that defendant Pearle does not employ or pay defendant Holly for his services. All charges for examination by Holly are paid directly to him by the clients or patients."

It is apparent that the district court correctly invoked the criteria of the extent of control which Pearle could exert with respect to Holly's capacity as an optometrist. Whether Pearle had a greater degree of control by virtue of its relationship with Holly in his non-optometric services, that is those services provided at the Pearle Vision Center, is not important with respect to the Board's position.

The Board finds fault with the reasoning of the district court, but it has not presented to this court any facts from the record or a legal theory which persuades us that the district court's determination was erroneous. The Board urges us to follow the decision of the California Court of Appeals in the case of *California Association of Dispensing Opticians v. Pearle Vision Center, Inc.*, 143 Cal.App.3d 419, 191 Cal. Rptr. 762 (1983). This case is the primary authority relied upon by the Board in pursuing this litigation, and it was the premise of the attorney general's opinion upon which the Board acted. The California court held that a royalty provision similar to the one in the franchise agreement in issue here resulted in violations of the California statutes. The court's holding reached the proposition of division of fees as well as a conclusion that the arrangement was in violation of the statutory prohibition in California against the practice of optometry by a corporation through a li-

censed optometrist. The opinion discloses, however, that there are significant differences between the California statutes and the Wyoming statutes. The statute in California is more inclusive with respect to the prohibition of profit sharing between an optometrist and a lay person; the prohibition against profit sharing is broader and different from one that inhibits " 'splitting' or dividing a fee." As we have indicated, we choose not to broaden the choice manifested by the legislature in Wyoming when it limited the prohibition as it did. We do not think that construction is necessary because the legislature in Wyoming did not manifest an intention to inhibit the freedom of an individual optometrist to engage in other legitimate business activities. We agree with the determination by the district court to reject the invitation of the Board to follow the California rule. Clearly, as the district court noted, the statutes in California are more extensive and more restrictive in terms of their prohibitions than the statutory scheme in Wyoming.

In addition, our understanding of the California case persuades us that the court there failed to examine the appropriate factors in reaching its determination as to whether a corporation exercised sufficient control over an optometrist franchisee so that it, in effect, was engaged in the practice of optometry through the optometrist. The California court determined that corporate control was manifested by: (1) Pearle's right to approve the site of the office and improvements and fixtures therein; (2) the provision which permitted the franchisee to finance payment for the franchise through Pearle; (3) the provisions that required that the franchise fee and the advertising contributions be based on gross proceeds; (4) the provision that required the franchisee to submit to periodic audits by Pearle; (5) the franchise requirement that a franchisee stock Pearle's approved line of eyewear; and (6) the provision that made the franchisee's choice of laboratory equipment subject to Pearle's approval. All of these factors, relied upon by the California court, are factors of control that relate to the relationship between Pearle and its franchisee in non-optometric functions. The fact that Pearle exercises control over franchisees in their optical dispensaries does not govern with respect to whether Pearle has any right to control the practice of optometry and, therefore, could be held to be practicing optometry through the franchisee. A finding that Pearle is engaged in the practice of optometry because of a contractual relationship or employment of a licensed optometrist could only be premised upon facts demonstrating that Pearle exercised control over the optometrist in his practice of optometry. It is incumbent upon the Board to demonstrate facts that constitute a violation of the statute rather than only to assert a theory that the franchise arrangement could function in a way that would violate the statutes.

An examination of the franchise agreement persuades us, as it did the district court, that Pearle does not exercise control over Holly in his practice of optometry. It does not set the fees he charges to his patients; it does not purport to control the manner in which he performs his optometric functions; it does not address his work schedule in the practice of optometry; it does not say anything about the patients whom he may or may not see; it does not send statements to Holly's patients; it does not receive payments made for Holly's optometric service from either the patients or Holly; nor does it purport to direct or control the conduct of Holly's practice of optometry in any other way. We conclude that the significant concern is control over the optometrist in his practice of optometry that might inhibit the freedom necessary for the optometrist to practice in a manner which assures that the interests of the patient are given primary consideration. That is the reason that the legislature may restrict the practice of optometry from corporate influence under its police power. The public is entitled to that protection. *K N Energy,* 755 P.2d at 207; *Matter of Mountain States Telephone & Telegraph Company,* 745 P.2d 563 (Wyo.1987). We cannot conclude that the legislature intended to restrict the practice of an optometrist, or to prohibit a corporation from contracting with an optometrist, however, unless

the arrangement permitted the corporation to exercise control over the optometrist in his optometric practice.

In stating the facts in its brief, the Board listed the requirements under the franchise agreement which it perceived as demonstrating the control exercised by Pearle over Holly. That itemization of requirements under the franchise agreement supports our holding. Every one of the factors that the Board points to as demonstrating the extent of Pearle's control over Holly relates only to the non-optometric activities of Holly as a franchisee of Pearle. This franchise agreement entered into by Holly with Pearle is a carefully drafted document, which perhaps tests the permissible limits of rights which Pearle may incorporate in its franchising agreements in Wyoming. Even though it may test those legally permissible limits, this agreement does not transgress the statutory inhibitions. We recognize that activities under such a franchise agreement could be carried on in such a way as to infringe upon the statutory prohibitions, but the Board has not demonstrated facts showing improper activities to be present.

The Board has called to our attention one advertisement which Holly placed that says, in part, "Our experienced doctor of optometry will give you a thorough eye exam * * *." It is not clear from the context whether Holly was held out as an employee of Pearle in this particular advertisement, and the Board has not included a claim of unlawful advertising in its theory of the case. We do agree that Pearle and Holly cannot justifiably argue that Holly is not an employee of Pearle if, at the same time, the advertisements published by either imply that Holly is an employee of Pearle. The fact is that Holly is not employed by Pearle, and it would be improper under § 33–23–110(b)(i), W.S.1977, for either to indicate to the public that Holly is employed by Pearle. The presence of this one advertisement, however, is not sufficient to affect our holding with respect to this case.

We conclude that the district court did not err in granting a summary judgment in favor of Holly and Pearle. We are in accord with the rationale of the district court's determination, and we affirm the district court in its judgment.

URBIGKIT, Justice, dissenting.

Application of economic realism should not leave question about the nature of this franchised eye care system constituting the corporate control and effectuated practice of optometry. To say otherwise is to ignore its clearly defined operational character.[1] Essentially presented by this appeal is whether approval and summary judgment resolution was justified for the non-application of Wyoming statutes relating to the regulation of this category of health care provider. The consistency between denial to a trained anesthesiologist of the opportunity to pursue his educational capabilities in *Paravecchio v. Memorial Hosp. of Laramie County*, 742 P.2d 1276 (Wyo. 1987), cert. denied — U.S. ——, 108 S.Ct. 1088, 99 L.Ed.2d 249 (1988) and this case,

---

1. A confusion in terminology can be found in the numerous cases and by casual references to the participants in the eye care industry correctable by differentiating the optician from the optometrist, the O.D., as also different from the medical doctor, the M.D., who may practice in this specialty. Wyoming, differing from California, has no optician licensing law. See *California Ass'n of Dispensing Opticians v. Pearle Vision Center, Inc.*, 191 Cal.Rptr. 762, 143 Cal. App.3d 419 (1983). Opticians do not examine eyes and would fall within the category of optical mechanics as differentiated in terminology by W.S. 33–23–101(b). In standard and accepted categorization, the structure of eye care personnel starts with the non-dispensing optician, as the mechanic; the dispensing optician who cannot conduct examinations, licensed in some states and not in others; the optometrist as a certificated professional with a specialized college degree requirement; and the medical professional practitioners, physicians, surgeons, and ophthalmologists (oculists). See definitions in *Williamson v. Lee Optical of Oklahoma*, 348 U.S. 483, 486, 75 S.Ct. 461, 463, 99 L.Ed. 563, reh'g denied 349 U.S. 925, 75 S.Ct. 657, 99 L.Ed. 1256 (1955); *Stern v. Flynn*, 154 Misc. 609, 278 N.Y.S. 598 (1935); *New Jersey State Board of Optometrists v. S.S. Kresge Co.*, 113 N.J.L. 287, 174 A. 353 (1934).

Dr. Holly is licensed to be and conducts a professional practice as an optometrist as confined and controlled by the Wyoming licensing statute, W.S. 33–23–101, et seq.

where by contract compulsion, detail and system operation, corporate franchise supervisory control of optometry is now justified, leaves me mystified.

Likewise mystifying is the theory of summary judgment by which this decision is determined. Even if the majority renders decision on a matter of law by a stage five *Cordova v. Gosar*, 719 P.2d 625 (Wyo. 1986) characterization or, perchance, factual resolution as stage six, genuine issues of material fact stand persuasively illustrated in concept and discussion from contractual documents and operational standards.

In initial review, it is immediately apparent that this case is not novel, nor is appellee Pearle Vision Center, Inc. (Pearle Vision), as a national franchising corporation, a stranger to similar litigation. Cases of this type involving franchise optometry include, for Pearle Vision in its various entities, *California Ass'n of Dispensing Opticians v. Pearle Vision Center, Inc.*, 143 Cal.App.3d 419, 191 Cal.Rptr. 762 (1983); *Will Ross, Inc. v. Florida State Bd. of Optometry*, 314 So.2d 152 (Fla.App.1975); *Pearle Optical of Monroeville, Inc. v. Georgia State Bd. of Examiners in Optometry*, 219 Ga. 856, 136 S.E.2d 371 (1964); *Pearle Optical of Monroeville, Inc. v. Georgia State Bd. of Examiners in Optometry*, 219 Ga. 364, 133 S.E.2d 374 (1963); *Pearl Optical, Inc. v. Pearle Optical of Ga., Inc.*, 218 Ga. 701, 130 S.E.2d 223 (1963); *Louisiana State Bd. of Optom. Exam. v. Pearle Optical of Alexandria*, 248 La. 1062, 184 So.2d 10 (1966); *Louisiana Bd. of Optometry Examiners v. Pearle Optical of Alexandria, Inc.*, 177 So.2d 164 (La.App.), writ granted 248 La. 426, 179 So.2d 19 (1965), rev'd 248 La. 1062, 184 So.2d 10 (1966); and *Small v. Maine Bd. of Registration and Examination in Optometry*, 293 A.2d 786 (Me.1972). See generally Annotation, *What Constitutes Practice of "Optometry"*, 88 A.L.R.2d 1290 (1963).[2] The conflict between corporate practice and individual responsibility of the certificated practitioner is not limited to optometry. In recent time, dentistry, as well as law, has sustained its conflicts. See an earlier regulatory confrontation, *Barron v. Board of Dental Examiners of California*, 109 Cal.App. 382, 293 P. 144 (1930).

Factual issues which relate to the status of the health care practitioner within the franchise system include: (1) authority and control; (2) whether optometry is a learned profession; (3) fee splitting; (4) usage of cappers and steerers; (5) percentage royalty, compensatory system; (6) effectuated corporate practice of optometry franchise system and contractual supervision; (7) whether statutory violation requires an employer/employee relationship; and (8) fundamental nature of relationship by virtue of financing control.

A logical resolution of issues raised about police power regulation to resolve issues of both fact and law requires consideration of exercised commercial expertise and franchising systems. *Williamson v. Lee Optical of Oklahoma*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563, reh'g denied 349 U.S. 925, 75 S.Ct. 657, 99 L.Ed. 1256 (1955); *Semler v. Oregon State Board of Dental Examiners*, 294 U.S. 608, 55 S.Ct. 570, 79 L.Ed. 1086 (1935). Where this case presents a summary judgment, the detailed factual delineations by the majority define

**2.** The history of Pearle Vision, symptomatic of merchandized health care, is informative. Pearle was incorporated in 1962 by Stanley C. Pearle, O.D., as merged into Opticks, Inc. as an affiliate system in 1973. The entity was acquired by Will Ross, Inc. in 1969 and then merged into G.D. Searle & Co. in 1973 to become a wholly owned subsidiary. In 1983, drug supplier Searle, by establishment of Pearle's Health Services, Inc., which owns, as its affiliate, Pearle Vision Center, Inc., the litigant in this case, resold 55.4 percent of the outstanding common stock and retained as of the date of the circular found in the record, 44.3 percent. As of circular date of April 1, 1985, there were more than 800 retail optical stores doing business under the proprietary service mark Pearle Vision Centers, which include three types of franchises: (1) company-owned Pearle Vision Center (company-owned store); (2) a newly constructed Pearle Vision Center (new store); or (3) the owner of an existing optical store which may convert to Pearle Vision Center (owner-converted store). Within this categorization, the Cheyenne, Wyoming operation and licensing arrangement held by Dr. Holly, would be category (2), as a new store.

the obvious doubt in disposition justification.[3] In economics, Pearle Vision is in the eye care business in a not dissimilar fashion from McDonald's hamburgers or Holiday Inn's motor hotels. The last listed sells a place to stay overnight with accouterments; McDonald's supplies fast foods; and Pearle Vision, the medical service of eye care diagnosis and equipment sales. The only differentiation develops in requirement to enforce a legislative policy that those who examine eyes and prescribe glasses should have a defined level of professional training and responsibility.

In times past, the five-and-dime department stores had glasses, frames, separate lenses and, even on some occasions, refractory machines so that the customer could test himself. *New Jersey State Board of Optometrists v. S.S. Kresge Co.*, 113 N.J. L. 287, 174 A. 353 (1934). Whether that practice still exists anywhere is not announced by this record, but certainly not to be found in Wyoming. Pearle Vision and similar national franchisers are the successor for accommodative sales of vision products by leasing heavy traffic retail store sites. Conjunctively, it was quickly recognized by management of franchising and company store operations that availability of personnel for examination is required for the eye glass merchandising operation.[4] Consequently, in states where permitted, the franchiser secures licensed practitioners to provide the required operational mechanism for economic viability. This is achieved by selling a percentage rent, large sum advance fee franchise under a very detailed operational contract. Every aspect of the business operation, except standards set by occupation and certificating standards for the care of specific eye examinations, is subjected to regularized supervision and detailed documentary control.

It is the operational economic entity that we must examine to evaluate conflict with the Wyoming health care regulatory statutes. It might not be different in precept from a system that would franchise lawyers' offices with included business of selling books, forms, wills, agreements and pro se pleadings.

It is not acceptable that jurists, who may obtain their eye care from ophthalmologists, fail to recognize the health care responsibilities to the citizens of the state when provided by optometrists. The legis-

---

**3.** The comprehensive factual analysis by the majority would appear to define the modus decimandi for a factual inquiry sufficient to structure a genuine issue of a material fact in summary judgment concepts. However, the terminology of the majority calls this assumption into question in that in result, it appears that the majority determines that as matter of law the Wyoming legislature has not limited corporate practice of optometry within the character of contractual relations exercised by Pearle Vision.

**4.** It is naive to ignore the essential nature of the franchised eye care business. First, a need must be created and thereafter the need is met by the sale of materials for correction and appearance. Of the essence of the Pearle Vision operation, as well as other similar corporate approaches involving franchise arrangements, is the on-site availability of examination which is required to create the need from which the sales can be made. The predominant of the operation is the product sale. Documents available for this operation suggest that about twenty-five percent of gross volume receipts are derived from health care professional service and seventy-five percent from merchandise sale. If the cost of the merchandise is deducted as a gross profit computation, the totals are about one-third eye examination and two-thirds merchandising.

Although the self-starter for the corporate operation is eye examination, the determinate of the business purpose and principal activity is product sale. *Seifert v. Buhl Optical Co.*, 276 Mich. 692, 268 N.W. 784 (1936). The operational function for the franchised business is the direct reverse of the normalized ophthalmologist or optometrist who conducts a health care practice for the examination to be the predominant function and where, if provided, product sales is the adjunct. In the franchise system, the business purpose is merchandising while the essence of the independent ophthalmologist and optometrist activity is founded in providing a health care.

The business operation can become a police power regulatory concern properly addressed in legislation by controls, limitations and prohibitions to the degree that merchandising processes can supplant principles of individualized health care services.

The penumbra between optometry and effective private enterprise as unfettered by government and protection of citizens in receipt of health care services is a territory of decision clearly emplaced in legislative discretion by separation of powers. Wyo. Const. art. 2, § 1.

lative purpose addressed in statute is not necessarily effectuated by the commercialization perspective of the Pearle Vision advertising program manual with cover slogan stating, "Nobody Cares for Eyes more than Pearle." A comprehensive analysis of the documentary detail in offering circular, operating plan, franchising agreement and financing arrangement leaves little doubt about the intrinsic operation of the franchising of eye care services and equipment for retail distribution. Any effort embraced by the majority to disassociate the licensed optometrist from the contrails and tentacles of the in-place system simply fails in factual analysis.[5]

The abnormality implicit in present discussion and decision by the majority is disposition of a comprehensive course of business-professional certification case by approval of granted summary judgment contrary to the posture of the state licensing agent. The responsibility chargeable to the agency is to assure the competency of optometrists and to prevent conduct on their part which would do harm to the public. *Sage–Allen Co. v. Wheeler*, 119 Conn. 667, 179 A. 195 (1935).

The substantial analysis of some of the facts by the majority affords credence to the supposition that the summary judgment conclusion is justified since Pearle Vision's operation, whatever it may be in fact, does not inappropriately conflict with the strictures of Wyoming statute as a matter of law. Otherwise, on this record, there is no proper way to sustain the trial court as a finding of absence of a factual issue from the present record. Clearly, both the scope of the regulation, control and involvement of the corporate franchiser, as well as the specific opinion information of the affidavits by the Wyoming State Board of Examiners of Optometry (Board) reject any rational decision finding absence of any evidentiary conflict, including proffered characterization of the franchisee as in effect only an employee; albeit as it may be indentured in financial obligation.

Under the criteria of the many decisions of this court and in order to achieve a conclusion of this action as a decision of law, *Cordova*, 719 P.2d 625, the issues be-

---

5. A letter dated June 24, 1985 to Dr. Holly from a supervisor of franchise accounting stated:

There are several procedures contained in the Franchise Accounting Section which will help you to understand our weekly and monthly routine and the part you play. They are as follows:
1. XIII–2 (Call-in): Every Monday morning you are asked to call in the previous week's sales to your supervisor.

See Confidentiality Agreement form of execution:

Signature: Robert L. Holly, O.D.

| Title: | Optometrist |
| --- | --- |
| Date: | 7/29/85 |
| Franchisee: | Robert L. Holly, O.D. |
| Franchise Location: | 96701 967101 |
| | Frontier Mall # I–1 |
| | Cheyenne, WY |

The Franchise Agreement, section 3.1, stated:
(B) Franchisee hereby expressly acknowledges that adherence to each and every provision of the Pearle System is reasonable, necessary and essential to maintain the uniform image and favorable reputation of each Pearle Vision Center and the success of Pearle's franchise program. Accordingly, Franchisee expressly agrees to comply with each and every requirement of the Pearle System during the term hereof, as the same may be modified or changed from time to time by Pearle in its sole discretion.

Section 3.3, *Goods and Services* stated:
During the term hereof, Franchisee shall provide or shall cause to be provided at or in conjunction with the Location, the following goods and services and no other goods or services without Pearle's prior written approval:

\* \* \* \* \* \*

(F) As permitted by law, optometric services, such as eye examinations and re-examinations, which services shall be provided by a duly licensed optometrist or ophthalmologist. The contract also includes noteworthy restrictions on inventory and supplies, section 3.4; suppliers and services, section 3.5; required prior approval of other products, section 3.6; and specific ownership, non-transferability provisions without purchase and first right options held, retained by Pearle Vision. See Term; section 1.3; Grant of Successive Franchise (for succeeding terms), section 1.5; Assignment: Conditions and Limitations, section 14; Right of First Refusal, section 15; and Events of Default by Franchisee, section 16.5.

Consequently, if the franchisee loses his optometrist's license, he loses his franchise and all the fruits of the singular investment required for involvement in the business.

tween the parties must be resolved no matter how the relevant facts may be distributed so that only challenged questions of law are presented. Clearly, several questions of factual difference exist in this appeal, i.e., whether advertising was in fact steering, *Akin v. Louisiana State Board of Optometry Exam.*, 150 So.2d 807 (La.App. 1963); is Pearle Vision engaged in the practice of optometry by having a contractual percentage right to all of Dr. Holly's business income regardless of how generated from dispensary merchandising or by professional health care examination; and more conclusively, what is the net effect on the health care practitioner of the thirty-four causes for default as a factor of direct control.

In the nature of the business enterprise, if the health care examinations are conducted at a sufficiently slowed sequence, the retail business operation will fail and financing and leasing default will occur. Consequently, in order for the practitioner to avoid default, there is a requirement of performance at not less than some definable speed irretrievably planted within the system in order to create the customers for the dispensing business. The web of operational relationships as considered within regulatory activity of the agency and the supervisory mandates of the legislation logically denies summary judgment disposition as a matter of law.

Here, each party moved for summary judgment, so either is faced in resistance with a showing based on the nationally used franchising documents, a few affidavits and brief depositions that there was no genuine issue of fact for trial. Substantively, unless all of the affidavits submitted to the court are either considered to be inadmissible hearsay or conclusory, no other reason is perceived to justify that intimation. *People v. Sterling Optical Co.*, 26 Misc.2d 412, 209 N.Y.S.2d 953 (1960). Cf. *State ex rel. Fatzer v. Zale Jewelry Co. of Wichita*, 179 Kan. 628, 298 P.2d 283 (1956), where an extensive record was developed at trial.

The relationship of the optometrist to the national franchiser and their relationship to the Wyoming licensing law lacks definition unless inquiry is made about the specifics of the contractual documents and operational processes. Pearle Vision is a well-organized and experienced franchiser, and as to be expected, provides comprehensive contractual documentation for analysis. The basic agreement signed between the optometrist and Pearle Vision as franchise documents are the franchise agreement of forty-six pages, a sub-lease for the shopping center premises which includes the shopping center lease between center management and Pearle Vision, a real property equipment lease, ownership of franchise certificate, a guarantee, a confidentiality agreement, a statement of assets to be purchased and fees to be paid, a loan agreement, and a promissory note. Financially, the transaction as a franchise relationship encompasses a percentage fee of gross business done as including not only merchandise sale of eyewear products, but also optometrist's services. Those include the franchise royalty of eight and one-half percent, advertising of eight percent and rent of eight percent on receipts in excess of $13,166.67 monthly. Consequently, the monetary relationship as a percentage fee is twenty-four and one-half percent of gross business, except that the rental fee is floored at a minimum business volume.

The operation is constructed initially by Pearle Vision's acquisition of the shopping center space and lease and remodeling and construction of the facilities for the retail purpose of eye glass sales and optometry business. A $15,000 fee is charged to the prospective franchiser and the balance of Pearle Vision's construction costs and equipment purchases are secured by security agreements when sold to the operator by a financed installment obligation, including a three percent above prime monthly interest charge. Operationally, purchases of optical supplies and equipment are contractually controlled as directed to franchiser. Basic local and national advertising is composed and placed by Pearle Vision and exclusive occupation and management responsibility is imposed. Facility operation is supervised, including hours and method.

Accounting, auditing and reporting is rigidly structured.

The more singular facet of the relationship which determines the status of the parties is restrictions on sub-lease, resale and heirship, including an all inclusive first right of refusal on transfer. Extraordinarily confining and severe factors of default are enunciated by agreement which permits cancellation of the lease and the franchise. The Board fairly states that "Pearle's Franchise Procedure Manual contains in excess of 250 pages of detailed requirements with which [franchisee] must comply."

With recognition of the status of trial court summary judgment disposition, it is fair to find some record justification and evidentiary support for the following statements in a certified public accountant expert witness affidavit filed by the Board:

12. The concept of the super store in optometrics provides for profits to be generated as a result of the sale and cross-sale of all services under the recognizable name of the retail operation.

13. According to the franchise agreement, Dr. Holly is not allowed to sell his investment, expand his optometric practice or perform any other optometric services without the written approval of Pearle Vision Center, Inc.

\* \* \* \* \* \*

15. Based on my research and information, it is my opinion that Dr. Holly is in the same position and under the same controls as that of any employee.

See *California Ass'n of Dispensing Opticians,* 191 Cal.Rptr. 762 and *Zale Jewelry Co. of Wichita,* 298 P.2d 283.

The cases which relate in some fashion to the economic pursuit of merchandizing eyewear by affiliation with a licensed eye care examiner are near legion. Some differences are explainable by outdated attitudes about the health care nature of eye treatment. See *Klein v. Rosen,* 327 Ill. App. 375, 64 N.E.2d 225 (1945). Other divergences in general results are explained by statutory difference. A striking example of these kinds of opposite results are evidenced in the contact lens cases de-

fining what cannot be done by the dispensing optician. *Florida Ass'n of Dispensing Opticians v. Florida State Bd. of Optometry,* 227 So.2d 736 (Fla.App.1969), aff'd in part and quashed in part 238 So.2d 839 (Fla.1970); *State ex Inf. Danforth v. Dale Curteman, Inc.,* 480 S.W.2d 848 (Mo.1972); *New Jersey State Bd. of Optometrists v. Reiss,* 83 N.J.Super. 47, 198 A.2d 816 (1964); *State ex rel. Reed v. Kuzirian,* 228 Or. 619, 365 P.2d 1046 (1961).

To fashion a proper analysis of the error in the majority opinion, initial reference to Wyoming statutes is required. First and obviously, any recitation that under the statute optometry is not a learned profession is insupportable in fact and unjustified in legislative intent. Criteria for initial education, W.S. 33–23–109; continuing education certificate, W.S. 33–23–114; certification, W.S. 33–23–103; permitted use of pharmacological agents, W.S. 33–23–102; with special course requirements, W.S. 33–23–109; leaves no statutory intention question as to the nature of the education and the health care expertise required for optometry practice. *State ex rel. State Bd. of Examiners in Optometry v. Kuhwald,* 372 A.2d 214 (Del.1977), judgment rev'd 389 A.2d 1277 (Del.Supr.1978); *State ex rel. Londerholm v. Doolin,* 209 Kan. 244, 497 P.2d 138 (1972); *McMurdo v. Getter,* 298 Mass. 363, 10 N.E.2d 139 (1937); *Neill v. Bloch,* 330 Pa. 222, 199 A. 182 (1938). The seriousness of concern about the use of pharmacological agents by the optometrist in examination or treatment arose in enactment of 1977 Wyo. Sess. Laws ch. 17 and 1987 Wyo. Sess. Laws ch. 139 now found in W.S. 33–23–102 with education and expertise centered in issue. Wyoming moved further in required expertise with augmented function permitted to the licensee by legislative enactment.

An interesting American history can be developed in analysis of the cases and authorities as eye examination moved from self-prescription in five-and-dime department stores to the increasing levels of professionalism and education as present requirement of optometrists. *McMurdo,* 10 N.E.2d 139. At the same time, national

franchisers or chains such as Pearle Vision moved into the dispensing and merchandising businesses for sale of the eye care products. Conflict between the medical doctors and their specialists, the ophthalmologists, with the optometrists, is defined in determination for the proper function of the optometrist on one side while conflict has escalated between the optometrist and merchandisers and/or opticians as the mechanic on the other side. It has been stated that the contrary results among some cases result from a foundational conflict of whether optometry is a learned profession or only a practitioner of trade like the optician. In present time, except by statement of the trial court and reference in the majority's opinion, continued discussion is a rarity since obviously adequate eye care requires examination expertise and that competency is recognized by certification requirements for the practitioner by detailed state statutes. Any denial of optometry as a learned profession within health care services is patent nonsense in modern terms. *Lieberman v. Connecticut State Board of Examiners in Optometry*, 130 Conn. 344, 34 A.2d 213 (1943). The analysis of law and philosophy was well-stated in *State ex Inf. McKittrick v. Gate City Optical Co.*, 339 Mo. 427, 97 S.W.2d 89, 90–91 (1936):

The question for determination is whether the conduct of the respondents, as shown by the evidence, constitutes practicing optometry within the meaning of the optometry code.

A like question has been ruled by the courts of several of our sister states, and there is contrariety among their rulings upon it. The discordance appears to be due to differences in the terms of the statutes and public policy of the several states. * * *

\*    \*    \*    \*    \*    \*

* * * it is apparent that, apart from specific legislative classification of optometry as, or use of terms implying the practice of optometry to be a profession, the one line of decisions seems to proceed on the theory that the legislative object as disclosed by the particular optometry code—the public policy of the particular state—was to preserve public health and welfare by requiring the practice to be kept on the plane of professional ethics and scientific learning, as in the so-called learned professions. The other line, on the normal plane of ethics and practical business economy. In a case of the latter class it is said that "the science of optometry, though it may require much preparation and skill, is not commonly known as one of the learned professions."

Forcefully stated in modern terms, the court in *Eisensmith v. Buhl Optical Co.*, 115 W.Va. 776, 178 S.E. 695, 697 (1934) (quoting from *Commonwealth v. Houtenbrink*, 235 Mass. 320, 126 N.E. 669, 670 (1920)) related:

[T]he kind of work undertaken by the optometrist "bears such intimate relation to the health of mankind as to bring it within the power of legislative supervision through the exercise of the police power. Vision is essential to the highest usefulness of the individual. The eye is proverbially a delicate organ. It is closely connected with intellectual, nervous and physical functions. Advice as to its care and prescribing for the correction of its defects by tests and examinations without the use of drugs is closely connected with health."

See also *Melton v. Carter*, 204 Ark. 595, 164 S.W.2d 453 (1942); *Lee Optical of Ga., Inc. v. Georgia State Bd. of Examiners in Optometry*, 220 Ga. 204, 138 S.E.2d 165 (1964); *Pearle Optical of Monroeville, Inc.*, 133 S.E.2d 374; *Kendall v. Beiling*, 295 Ky. 782, 175 S.W.2d 489 (1943); and *Ezell v. Ritholz*, 188 S.C. 39, 198 S.E. 419 (1938).

The second clearly defined fact is that corporate practice of optometry is not permitted under Wyoming statutes, and if the essential nature of the business here presented is corporate practice of optometry, it is illegal. Wyoming statutes are specific and resort to a large volume of cases in similar result is not required. W.S. 33–23–111, in stating it is unlawful for "any corporation, directly or indirectly, to practice optometry * * *," says it all.

*Funk Jewelry Co. v. State ex rel. La Prade,* 46 Ariz. 348, 50 P.2d 945 (1935); *State Board of Optometry v. Gilmore,* 147 Fla. 776, 3 So.2d 708 (1941); *State ex rel. Beck v. Goldman Jewelry Co.,* 142 Kan. 881, 51 P.2d 995 (1935); *Kendall,* 175 S.W. 2d 489; *Dickstein v. Optical Service, Inc.,* 19 Misc.2d 495, 191 N.Y.S.2d 642 (1959); *Stern v. Flynn,* 154 Misc. 609, 278 N.Y.S. 598 (1935); *State ex rel. Sisemore v. Standard Optical Co.,* 182 Or. 452, 188 P.2d 309 (1947); *State ex rel. Standard Optical Co. v. Superior Court for Chelan County,* 17 Wash.2d 323, 135 P.2d 839 (1943); *Eisensmith,* 178 S.E. 695.

Finally, in conjunction with the issues of steerers,[6] cappers, etc., we consider the essential nature of the business organization and relation and not the visage or tinting applied to camouflage what, in fact, exists. *Akin,* 150 So.2d 807. The dedication of the Wyoming legislature to rights of freedom of choice in selection of licensed eye care practitioners is specifically addressed in W.S. 33–32–101:

> No person, department, commission, board, official, employee, or agency of the state of Wyoming or any county, municipality, school district or other subdivision of the state of Wyoming, or any other state or county agency or any other governmental unit of any kind or character shall interfere with any patient's exercise of freedom of choice in the selection of practitioners licensed to perform examinations for refractions and visual training and visual corrections

within the specific area for which their state licenses entitle them to practice. That intent for freedom of choice is not confined to the text of that statute only but flows from the optometry code as found in the first criteria of unprofessional and dishonest conduct. "The loaning of his license by any licensed optometrist to any person; * * *." W.S. 33–23–110(b)(i). See further, W.S. 33–23–110(b)(ix):

> The board, when necessary for administration of this act, may clarify the definitions stated in this subparagraph (b) by unanimous action of the board, provided that the meaning and effect of this law shall not thereby be added to or diminished.

In addition to the limitations provided by the unprofessional/dishonest conduct definition, the following specific proviso of W.S. 33–23–111(b)(iv) cannot be so casually ignored as the majority seeks to do:

> For any person or persons not holding a certificate or any corporation, directly or indirectly, to practice optometry by employment of or contract with a person holding a certificate, or otherwise, * * *.

Franchising of health care services, law, accounting or engineering can be no less appealing than nursing homes, hamburger sales and motel facilities.[7] This difference is the individual responsibility of the practitioner to his client or patient that is implicit both in Wyoming statutes and pervasive precedent in the nature of an individual who is honored to be designated as a member of a true profession. The delineation presented by the courts is to determine

---

**6.** See definition in *People v. Simmons,* 109 N.Y. S. 190, 194 (1908):

A "steerer" in slang vocabulary is a person of plausible manners and address, who gains the confidence of the person intended to be fleeced. Century Dictionary, "Steerer."

**7.** The public interest was expressed:

If such a course were sanctioned the logical result would be that corporations and business partnerships might practice law, medicine, dentistry or any other profession by the simple expedient of employing licensed agents. And if this were permitted professional standards would be practically destroyed, and professions requiring special training would be commercialized, to the public detriment. The ethics of any profession is

based upon personal or individual responsibility. One who practices a profession is responsible directly to his patient or his client. Hence he cannot properly act in the practice of his vocation as an agent of a corporation or business partnership whose interests in the very nature of the case are commercial in character.

*Ezell,* 198 S.E. at 424.

A singular recognition that vision may not be seeing and that vision experts are not all the same is profiled in Roseman, *Vision Overlooked,* 93 Case & Com. 12 (1988). His well-made point is the prevalence of operational blindness within much of our population, which may largely be the result of the insufficient or incompetent eye examinations.

where, by franchising services, the contractual control over the professional should be denied to the corporate environment. In my persuasion, that line was crossed substantially before the status is reached as evidenced by the intrinsic agreements and essential nature of this transaction between the optometrists and the franchiser provision.

As stated in *Lieberman,* 34 A.2d at 216 (quoting from *McMurdo,* 10 N.E.2d at 142), it is

> the principle which forbids a licensed member of a profession to practice among the public as the employee of an unlicensed person or corporation "recognizes the necessity of immediate and unbroken relationship between a professional man and those who engage his services."

See *Zale Jewelry Co. of Wichita,* 298 P.2d 283.

There is a curious nonsequitur in the majority's reasoning to disregard the most extensive current authority, *California Ass'n of Dispensing Opticians,* 191 Cal. Rptr. 762, by a differentiation of California's more inclusive statutes. I disagree with the differentiation factually and with the denial of persuasion and authority. The only real factual difference is that opticians are licensed in California as the mechanics of eye glass manufacture and fitting, but the essential character of Wyoming statutes as related to the professional, the optometrist, is realistically identical. California has obviously had an administrative agency of more forcefulness in adoption of regulations, but the statutory premises that California has a long-standing public policy against permitting laypersons to practice any of the medical arts or to exercise control over decisions made by any healing art practitioners is not different from Wyoming.

In enunciating the illegality that the court found, the specific facts that were demonstrated are identical, or at least similar, to the franchise documents which have been brought from California and other states to be used in Wyoming.

From the face of the franchising agreement it is clear Pearle had the power to control many facets of the optometrist's practice of optometry. For example, with respect to real property arrangements, Pearle must approve the site of the optometrist's office. If the franchisee is purchasing an existing site from Pearle, he must also purchase all improvements. If he wishes to obtain a new site, Pearle must approve all proposed leasehold improvements, furnishings, fixtures, inventory and supplies which are obtained from anyone other than Pearle.

Pearle also exercises a variety of controls over financial aspects of a franchisee's practice. According to the circular a franchisor may "finance" franchisees, and the franchisee must pay a substantial percentage of his gross income to the franchisor as both a "franchise fee" and as an advertising contribution. Franchisees must utilize the Pearle "system" relative to operating the practice and must use the franchisor's design specifications for offices. Furthermore, the franchisee is subject to periodic audits by the franchisor. Substantial penalties can be assessed if the audit is unfavorable to the franchisee.

A separate and distinct specie of control lies in the franchisor's control over a variety of treatment decisions to be made by the optometrist. A franchisee is required to stock all of Pearle's approved frame lines, to carry an inventory of prescription lenses and other optical goods and supplies approved by Pearle. Pearle has sole discretion to modify frame lines, and specifications for optical goods. Finally, the franchisee's choice of laboratory is limited to those approved by Pearle.

Reservation of this authority over an optometrist by a nonhealing arts practitioner is against public policy and clearly illegal.

Id. at 768.

The court goes on to consider control over advertisement, use of the name for the facility, profit-sharing and co-ownership arrangements, and gross royalty require-

ments which include services performed as a professional as further basis to define the transaction as an illegal corporate practice of a profession.

The differentiation that the majority seems to make that the supervisory control over the franchise extends only to the dispensing and not to the examination is not accurate. Each and every factor of accounting, operation, management, lease restraints, and resale limitations fall equally upon both optical sales and health care activity since *all* documents relate equally and directly to both. If the franchise is rescinded and the lease is revoked, the optometrist and the businessman as a single entity is identically out of business, although the note remains unpaid and the non-competition covenant undiminished. Required monthly payments for purchase, rental franchise and advertising as computed upon optometric practice equally confines and controls professional services like merchandise sales. With unquestioned division of optometric service fees with Pearle Vision presented, the reasoning of this decision seems more than clouded in explaining how percentage fees escape exculpation. *Lieberman*, 34 A.2d 213; *Hanks v. Hamilton*, 339 So.2d 1122 (Fla. App.1976), cert. denied 352 So.2d 171 (Fla. 1977); *State v. Abortion Information Agency, Inc.*, 69 Misc.2d 825, 323 N.Y.S.2d 597 (1971). Cf. *Natchez v. State*, 721 P.2d 361 (Nev.1986), where an optometrist cannot be the employee of an opthamologist.

The characterization in one of the Board's affidavits that Dr. Holly is essentially an employee of Pearle Vision, may be overstated (see, however, *Zale Jewelry Co. of Wichita*, 298 P.2d 283), since indentured agent might be more responsive. I would

conclude, within the entirety of documented control and regulation, that there is an issue of fact to consider the existence of a violation by an uncertified corporation. *Capitol Optical Co. v. State Board of Optometry*, 220 Miss. 34, 70 So.2d 15 (1954); *Sears, Roebuck & Co. v. State Board of Optometry*, 213 Miss. 710, 57 So.2d 726 (1952); *State ex rel. Bricker v. Buhl Optical Co.*, 131 Ohio St. 217, 2 N.E.2d 601 (1936); *State ex rel. Loser v. National Optical Stores Co.*, 189 Tenn. 433, 225 S.W.2d 263 (1949). To be weighed at trial is the reality. Dr. Holly is at will in business placement, actively controlled at continuous risk of default, and confined in transferability or resale. Control is not inappropriately defined either as he who calls the tune, or by the golden rule, he who has the gold rules.[8]

Fundamentally we are taught by the wisdom of many preceding jurists that it is the essential operation which achieves regulatory significance—how, what and when —and the effect on a defined public interest. *Rowe v. Standard Drug Co.*, 132 Ohio St. 629, 9 N.E.2d 609 (1937); *National Optical Stores Co.*, 225 S.W.2d 263. See, however, *Rowe v. Burt's Inc.*, 31 N.E. 2d 725 (Ohio App.1939). Also see *Zale Jewelry Co. of Wichita*, 298 P.2d 283 and *Goldman Jewelry Co.*, 51 P.2d 995. Compare for more limited contract, *State v. Ballez*, 102 Ariz. 174, 427 P.2d 125 (1967). See also *Ritholz v. Arkansas State Board of Optometry*, 206 Ark. 671, 177 S.W.2d 410 (1944); *State v. Plymouth Optical Co.*, 211 N.W.2d 278 (Iowa 1973); *State v. Kindy Optical Co.*, 216 Iowa 1157, 248 N.W. 332 (1933); *Sears, Roebuck & Co.*, 57 So.2d 726; and *Rithholz v. Com.*, 184 Va. 339, 35 S.E.2d 210 (1945). It is not labels, artifices or subterfuges which are sufficient to de-

8. The franchise agreement provides as events of default by a franchisee, which in result controls both hours and methods of operation of both dispensing and clinic, a right of termination by franchisor occurring upon any of the items of default which are enumerated in thirty-four provisions as specifics and generally circumscribed within the terminology of section 16.5(i) and (xxxiii) of the Franchise Agreement:

(i) Failure of Franchisee to maintain and operate the Pearle Vision Center in accordance with the specifications and standards of

the Pearle System or as set forth in the Pearle Manual;

\* \* \* \* \* \*

(xxxiii) Default by Franchisee or default by any operator, shareholder, partner, member or affiliate of Franchisee under any Agreement to which Pearle and any such person or entity are parties, including but not limited to any franchise agreement, lease, sublease, loan agreement, promissory note or security agreement.

termine regulatory interest and prohibitory reaction. It is impermissible to incorporate to engage in optometry or to do individually what is forbidden to do directly. *Buhl Optical Co.*, 2 N.E.2d 601. This subject was best stated in *California Ass'n of Dispensing Opticians*, 191 Cal.Rptr. at 773:

> Pearle by its franchise seeks to engage in the corporate practice of a profession. The rules against such practice should not be circumvented by technical agreements concerning the manner optometrists are engaged, designated or compensated by the franchisor. The confidential health care relationship requires the professional's undivided responsibility and freedom from commercial exploitation. This relationship is essential. The public would be jeopardized if a large corporation with pecuniary profits as its principal goal were allowed to dominate the field. (*Painless Parker v. Board of Dental Exam.*, supra, 216 Cal. 285, 298, 14 P.2d 67.)

In Wyoming, Pearle Vision can neither legally practice optometry nor employ optometrists for the examination portion of the eye care service that it seeks to sell. Neill, 199 A. 182. This summary judgment disposition makes no sense, logically nor governmentally, in determining, as a matter of law, something factually which is probably contrary to what actually happens.

The trial court grant of summary judgment favoring Pearle Vision should be reversed for trial on the merits.