Donald I. Mayfield, D.V.M. Veterinary Medical Examining Board #1 Natural Resources Drive P.O. Box 8505 Little Rock, AR 72215
Dear Dr. Mayfield:
This is in response to your request, on behalf of the Veterinary Medical Examining Board, for an opinion concerning the Arkansas Veterinary Medical Practice Act ("Veterinary Practice Act") and the Arkansas Professional Corporation Act ("Professional Corporation Act"). These acts are codified, respectively, at A.C.A. §§ 17-101-101 et seq. (Repl. 1995) and 4-29-201 et seq. (Repl. 1996). Your specific question involves the corporation "PetSmart." You state that PetSmart stores are operating in Arkansas as a corporation, and that according to your understanding the incorporators do not hold a license to practice veterinary medicine in Arkansas. You state further that "[t]hey are employing a licensed Arkansas veterinarian to operate their vaccination clinics which are held in the stores approximately once a month[;]" and that it is your understanding that ". . . the veterinarian does not have total control over the clinic as PetSmart sets the prices to charge clients and furnishes the vaccines given to the patients."
Your question in this regard is whether PetSmart is violating the Professional Corporation Act and the Veterinary Practice Act.
It is my opinion that the answer to this question will turn on the determination whether PetSmart is in fact employing a licensed veterinarian such that it is engaging in the practice of veterinary medicine by and through its licensed employees. Corporate employment of professionals is statutorily permitted to a class of corporations, under the Professional Corporation Act, supra. Ownership of those corporations is strictly restricted, however, to members of the specific profession being practiced. See A.C.A. § 4-29-208 ("[a]ll of the officers, directors, and shareholders of a corporation subject to this subchapter shall, at all times, be persons licensed pursuant to the laws of this state governing their profession.") The practice of veterinary medicine is clearly included within these provisions. See A.C.A. § 17-101-307(a) (restricting the practice of veterinary medicine to licensed veterinarians and holders of valid temporary permits issued by the Veterinary Medical Examining Board).
As I concluded in Attorney General Opinion 94-204 (copy enclosed) with regard to the corporate practice of medicine, a non-physician owned corporation may not lawfully employ licensed physicians for profit. This followed from the provisions of A.C.A. §§ 4-29-304 and -306 (part of the Medical Corporation Act), which authorize the corporate practice of medicine in Arkansas. The Medical Corporation Act requires owners, officers, directors, and shareholders to be persons licensed pursuant to the Act. Id.
Similarly, with respect to the corporate practice of veterinary medicine, a corporate enterprise is, in my opinion, prohibited from employing a licensed veterinarian, unless all of those who have a part in the "ownership, management, or control" of the corporation (A.C.A. §4-29-208) are licensed pursuant to the Veterinary Practice Act, supra.
This follows from the requirement in A.C.A. § 4-29-210(a) that "[n]o corporation shall open, operate, or maintain an establishment for any of the purposes set forth in §§ 4-29-202 and 4-29-206 without a certificate of registration from the state board . . . authorized by law to license individuals to engage in the profession concerned." See also VeterinaryMedical Practice Act Regulations (August, 1996, regulations promulgated by the Veterinary Medical Examining Board), Regulations 13 and 14 ("Veterinary practice may be by . . . duly registered corporations[;] and "no corporation may practice or offer to practice unless it holds a current corporate certificate from this Board.")
A determination whether a particular relationship between a corporation and a licensed veterinarian gives rise to the unauthorized practice of veterinary medicine by the corporation must be resolved on a case-by-case basis, following a review of all relevant facts and circumstances. Because the question you have posed is highly factual in nature, it is not readily resolved in the format of an opinion from this office. In addressing a particular relationship, I believe a court would likely look to the general definition of "employee" in order to determine whether a non-veterinarian owned corporation is unlawfully engaging the services of a licensed veterinarian. In this regard, Black's Law Dictionary (5th ed. 1979) defines "employee" as "[a] person in the service of another under any contract of hire, express or implied, oral or written, where the employer has the power or right to control and direct the employee in the material details of how the work is to be performed." Black's at 471.Black's goes on to state:
 Generally, when person for whom services are performed has right to control and direct individual who performs services not only as to result to be accomplished by work but also as to details and means by which result is accomplished, individual subject to direction is an `employee.'
Id.
You state in your request that PetSmart sets the prices to charge clients and furnishes the vaccines given to the patients. While these may be factors to consider, I cannot conclude based merely upon these facts that the employer/employee relationship exists such that PetSmart is unlawfully engaging in the practice of veterinary medicine. The fact that the licensed veterinarian does not have total control is not, in my opinion, determinative. Rather, as stated by the Wyoming Supreme Court with respect to the practice of optometry, "the significant concern is [the corporation's] control over the optometrist in his practice of optometry that might inhibit the freedom necessary for the optometrist to practice in a manner which assures that the interests of the patient are given primary consideration." Wyoming State Board of Examiners ofOptometry v. Pearle Vision Center, Inc., 767 P.2d 969, 978 (Wyo. 1989). The fact that the corporation did not set patient fees was only one factor influencing the court's conclusion in that case that there was no corporate control over the optometrist. The court also noted that the corporation did not purport to control the manner in which the optometrist performed his functions. Id. The optometrist retained control over the relationship with the patient; and that, I believe, is the primary concern. See also 1992 Iowa Op. Att'y Gen. 28 (1991 WL 495669 (Iowa A.G.)). It is not enough to simply observe that the corporation is employing the licensed professional. As stated by the Iowa Attorney General, "simply asking the question as to whether or not there is an employer-employee relationship begs the question — the factual question of dominion and control determines whether a prohibited employer-employee relationship exists, not the designation given that relationship in the parties' contractual arrangement." Id. at 6. The Iowa Attorney General observed that:
 . . . the common thread underlying the corporate practice prohibition is the vesting of improper dominion and control over the practice of a profession in a corporate entity. Where the corporation exerts undue dominion and control over the licensed professional, the corporation in essence becomes the `practitioner,' which is not permitted under statute. However, not all relationships between a corporation and a licensed professional are prohibited. Where . . . the licensed professional retains control over the relationship with the patient, the Court has declined to intervene by injunction.
Id.
A review of other cases discussed in the Iowa opinion indicates that, depending upon the particular circumstances, the inquiry may focus on the specific facts surrounding the business relationship between PetSmart and the licensed veterinarian, including the specific terms of any lease and any contract of employment for salary. See State v. Kindy Optical Co.,216 Iowa 1157, 248 N.W. 268 (1939), and State v. Plymouth Optical Co.,211 N.W.2d 278 (1973). These cases illustrate that this inquiry may shed light on the element of corporate control or influence, with the ultimate question being whether the licensed professional retains control over the relationship with the patient. See Iowa Op. Att'y Gen., supra.
In conclusion, I am in agreement with the Iowa Attorney General's statement that ". . . a mere recitation of the corporation's intent regarding the independence of the employed licensed professional, or the mere denomination as an `employee' would be only elements of the entire picture which would be examined." Iowa Op. Att'y Gen., supra at 8. The key inquiry appears to be the actual degree of independence of the professional, and similarly the extent of dominion and control by the corporation. Obviously, all of the facts and circumstances must be considered when viewing the particular relationship. I thus cannot, in the context of an official opinion, conclusively resolve the matter. The State Agencies division of this office will, however, upon request, offer legal assistance to the Board in the final decision-making process.
The foregoing opinion, which I hereby approve, was prepared by Assistant Attorney General Elisabeth A. Walker.
Sincerely,
WINSTON BRYANT Attorney General
WB:EAW/cyh